HENRY S. MALLOCH, ET AL.
PLAINTIFFS - APPELLEES
*vs.*
MAINE EMPLOYMENT SECURITY COMMISSION
DEFENDANT - APPELLANT

Kennebec.   Opinion, March 18, 1963.

*Clark D. Chapman, Jr.,*
*M. Donald Gardiner,* for Plaintiffs.

*Milton L. Bradford, Asst. Atty. Gen.,*
*Frank A. Farrington, Asst. Atty. Gen.,* for Defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, SIDDALL, JJ.   DUBORD, J., sat at argument, but retired before rendition of decision.

TAPLEY, J.   On appeal.   This case is on appeal from the final judgment of a single Justice of the Superior Court.   Action in the Superior Court was a judicial review of the decision of the Maine Employment Security Commission, Chap. 29, Sec. 16 (IX), R. S., as amended, and in accordance with Rule 80B, M. R. C. P.

Henry S. Malloch, plaintiff appellee, was employed by the American Can Company as a general laborer, the American Can Company being an employer subject to the provisions of the Maine Employment Security Law. Mr. Malloch was laid off for lack of work on July 31, 1961, whereupon he filed for unemployment benefits. He was entitled to benefits of $33.00 per week for total unemployment. He was allowed the sum of $21.00 per week as a reduced benefit under provisions of Sec. 3 (III) of the Maine Employment Security Law for partial unemployment. Mr. Malloch had reported receiving the sum of $22.17 under a plan entitled "Supplemental Unemployment Benefit Plan" (to be hereinafter referred to as the SUB Plan). Mr. Malloch appealed the ruling of the Commission to the Superior Court and after a hearing the sitting justice rendered judgment by sustaining the appeal on the basis of his findings that Mr. Malloch was entitled to the full amount of $33.00 in unemployment benefits for the week of August 12, 1961 notwithstanding the supplemental unemployment benefits payable to him under the SUB Plan. The Maine Employment Security Commission appealed this decision to the Law Court.

The question before us is whether the receipt of benefits by an employee under the SUB Plan constitutes wages within the meaning and intent of the provisions of the Maine Employment Security law (Chap. 29, R. S., 1954, as amended). The pertinent provisions of the Act are:

"**Sec. 3 (XIX).** 'Wages' means all remuneration for personal services, including commissions and bonuses and the cash value of all remuneration in any medium other than cash. The reasonable cash value of remuneration in any medium other than cash shall be estimated and determined in accordance with regulations prescribed by the commission, except that for the purposes of subsection II of section 13, subsection V of section 14, and section 17 such terms shall not include:

"**B.** The amount of any payment made after December 31, 1950 to, or on behalf of, an employee under a plan or system established by an employing unit which makes provision for his employees generally or for a class or classes of his employees, including any amount paid by an employing unit for insurance or annuities, or into a fund, to provide for any such payment, on account of retirement, or sickness or accident disability, or medical and hospitalization expense in connection with sickness or accident disability, or death; - - ."

"**Sec. 13 (III). Weekly benefit for partial unemployment.** On and after April 1, 1959, each eligible individual who is partially unemployed in any week shall be paid with respect to such week a partial benefit in an amount equal to his weekly benefit amount less that part of his earnings paid or payable to him with respect to such week which is in excess of $10 plus any fraction of a dollar except that any amounts received from the Federal Government by members of the National Guard and Organized Reserve, including base pay and allowances, shall not be deemed wages for the purpose of this subsection."

The Legislature, in the enactment of the Maine Employment Security Law, declared a statement policy in the following language (Chap. 29, Sec. 1, as amended) :

"**Statement of policy.** — Economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this state. Unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which may fall upon the unemployed worker, his family and the entire community. The achievement of social security requires protection against this greatest hazard of our economic life. This objective can be furthered by operating free public employment

offices in affiliation with a nation-wide system of public employment services; by devising appropriate methods for reducing the volume of unemployment; and by the systematic accumulation of funds during periods of employment from which benefits may be paid for periods of unemployment, thus maintaining purchasing power, promoting the use of the highest skills of unemployed workers and limiting the serious social consequences of unemployment. - - ."

This case rests, primarily, on statutory interpretation and construction.

"We have no hesitation in holding that statutes such as our Maine Employment Security Law are remedial and must be liberally construed for the purpose of accomplishing their objectives — in this instance the stabilization of employment conditions and the amelioration of unemployment." *Stewart v. Maine Employment Security Commission,* 152 Me. 114, at 120.

"In considering the action of the Legislature, the presumptions against unreason, inconsistency, inconvenience and injustices are not to be overlooked." *Brackett* v. *Chamberlain,* 115 Me. 335, at 340.

" - - - it is fundamental that we look *to the purpose for which a law is enacted* and that we avoid a construction which leads to a result clearly not within the contemplation of the lawmaking body. - - - -

"There is danger in extending a statute beyond its purpose, - - - ." (Emphasis supplied.) *Inhabitants of the Town of Ashland* v. *Wright,* 139 Me. 283, at 285.

The SUB Plan is an agreement entered into between the American Can Company and the International Association of Machinists. The purpose of the plan is:

"**Sec. 1.** It is the purpose of this plan to supplement state system unemployment benefits to the levels provided herein, and not to replace or duplicate them."

Under the terms of the SUB Plan the American Can Company (hereinafter called the Company) established a trust fund with a trustee selected by the Company. The fund is to be maintained by contributions made by the Company and benefits to the employees will be paid only from the fund. The initial maximum funding is set at $304,000 and from time to time payments will be made into the fund by the Company, as determined by a formula set out in the agreement. An employee, in order to obtain benefits, must make an application in accordance with procedures established by the Company and described in the SUB Plan and must also meet certain eligibility requirements. These eligibility requirements are based on the employee's layoff from the Company, the SUB Plan specifying conditions of layoff. The applicant, in order to benefit from the SUB Plan, must also be eligible to receive State Unemployment Benefits by qualifying for the same. He shall meet, in all respects, the statutory requirements of the Maine Employment Security Law. The amount of benefit the employee is to receive over and above the benefits paid to him under provisions of the Maine Employment Security Law is determined under a formula prescribed in the SUB Plan. It provides benefits for an employee who qualifies under its provisions, these benefits being supplemental to those allowed under the State system. There is much similarity between the provisions of the Maine Employment Security Law and the SUB Plan. They both provide for benefits to the unemployed, payable from a fund created for the purpose. They each prescribe qualifying conditions required to be met by the employee in order for him to receive the benefits. The SUB Plan and the Maine Employment Security Law have established formulae to be used in

determining the amount of benefits to be paid, and the length of time in which they are to be paid. The SUB Plan is effective only if the State has a law providing benefits based on unemployment, and if the employee can qualify for benefits thereunder. If the appellant's position is sound and the benefits paid under the SUB Plan are wages, then the Company must not only contribute to the State Unemployment Compensation Fund on the basis that the supplemental benefits are wages, but also must contribute to the fund established as a condition of the SUB Plan. The employee's only recourse for supplemental benefits is to the fund and not to the employer and, should depreciation or loss occur from the depreciation of the security held in the fund, the Company would not be obligated to make up the depreciation or loss. The SUB Plan is, in effect, an insurance against unemployment — it does not provide for the payment of any wages to the employee when no work is available to him. The SUB Plan does not guarantee wages, severance pay or standby pay. It is designed to supplement benefits paid under Maine Employment Security Law. The amount of the supplemental benefit is based upon the amount of the benefit the applicant is entitled to receive from the State system. The SUB Plan, using the State unemployment benefit as a basis, determines the amount to be paid the employee as supplemental benefits. The SUB Plan provides a fixed gross benefit but the Company, through the fund, does not pay this gross benefit. It pays only the difference between the State benefit and the total amount of the gross benefit. Under the SUB Plan two employees with the same work history, on the same job, may receive two different and distinct amounts as supplemental payments depending on the number of dependents they have. If these benefits were in the category of wages then there would be two different wage scales to be determined, not on the basis of labor performed on the same job classification and like work history, but on the number of de-

pendents of each worker. This standard of fixing wages would certainly present an incongruous situation.

The SUB Plan is the result of the natural growth of a modern relationship between management and labor. It is a product of the "bargaining table" and is in the nature of a fringe benefit through the terms of which the employee and his family are insured against a substantial portion of of an economic loss occasioned by unemployment. The SUB Plan embodies the principles of social security and the performance of its conditions results in the supplementation of a State unemployment benefit. It does not seek to defeat the interests of the State nor does it in any manner attempt, by its terms, to undermine the philosophy and purposes of the Maine Employment Security Law—rather, it embraces the philosophy and conforms to the purposes.

The SUB Plan employs provisions of the Maine Employment Security Law as standards upon which supplemental payments for unemployment are based. The SUB Plan is so dependent upon the existence of a State system that without it the SUB Plan is a nullity. This fact alone gives it the character of a supplemental agreement. The contributions the employer makes to the fund cannot, according to our view, be determined or characterized as wages paid to the employee for personal service rendered to his employer. According to the SUB Plan and the philosophy, as expressed in its purposes, the contracting parties never intended that the employee, in receiving benefits thereunder, would be accepting them as wages as the State contends. To so determine would be to do violence to the intent of the contracting parties. The appellant, however, takes the position, and so argues, that payment to the employee under the terms of the SUB Plan comes within the statutory definition of wages and that the Legislature, when it enacted the Maine Employment Security Law, intended that it should be so construed.

Since the advent of plans for supplementation of unemployment benefits, much controversy has arisen in the various States as to their interpretation in relation to State systems of employment security. There have been many opinions rendered by Attorneys General of various States on the subject and there are some recorded decisions of appellate courts.

The Supreme Court of North Carolina, in 1961, had occasion to consider the very question now before us. The pertinent provisions of a North Carolina Act are substantially like those of Maine. The language is nearly identical. A North Carolina case in point is, *In re Shuler*, 122 S. E. (2nd) 393 (N. C.). The court in the *Shuler* case goes into detail in pointing out various court and administrative decisions bearing on the question and states, on page 395, in holding that SUB benefits are not wages and therefore not deductible from benefits payable under the State System, as follows:

"(1) The contract between Dayco and Local Union No. 277 under which SUB payments are authorized, specifically provides: 'Neither the company's contribution nor any benefit under the plan shall be considered a part of any employee's wages for any purpose.' Another condition of SUB payments is that State law must permit 'supplementation' which is defined as 'recognition of the right of a person to receive both a state system unemployment benefit and a weekly supplement benefit under the plan for the same week of lay-off * * * and without reduction of the state system unemployment benefit.' Of course, the agreement of the parties as to their rights is persuasive but not necessarily binding on the Commission.

"(2) Supplementation of unemployment insurance benefits is designed to assist those employees who, on account of a lay-off due to no fault

of their own, are out of work. It is a method by which the employer, as suggested in G. S. c. 96, recognizes its public duty. The employer and the laid-off employee keep their connections each with the other. The relationship thus continued is likely to lead the employee to return to his job if and when it is available. Can it be said, therefore, that Dayco, by setting up the trust, and Shuler and Medford, by participating in it as laid-off employees, to the extent of their participation, received pay for work during the week beginning June 26, 1960? The reasons advanced and the cases cited in the Commission's excellent brief do not justify an affirmative answer.

Hence we conclude the Superior Court of Haywood County, and consequently the Employment Security Commission, erroneously deducted SUB payments from the unemployment insurance benefits due Shuler and Medford."

"The word 'wages' as used in provision of Unemployment Compensation Act limiting wages to all forms of remuneration received for personal services, includes only that which comes from personal efforts." Words & Phrases, Vol. 44A, Page 88.

This court in *Dubois* v. *Maine Employment Security Commission,* 150 Me. 494, considered the definition of "Wages" as related to a pension payment characterized as "Retirement Separation Pay." The "Retirement Separation Pay" was based on the formula of one week for each year of employment. The Commission held that the payment was remuneration for employment for the number of weeks determined on the basis of one week for each year of employment. In respect to wages, the court said, on page 501:

"We conclude - - - - - that in the weeks following separation these claimants were 'totally unemployed,' and were then *neither performing any*

*personal services nor receiving any wages or re-*
*muneration* 'with respect to' those weeks." (Em-
phasis supplied.)

The force of the *Dubois* case bears on the instant case,
particularly in reference to the fact (1) that Malloch at
the time he qualified for State benefits was totally unem-
ployed; and (2) the payment under the SUB Plan was not
for a personal service performed for his employer.

The Legislature, in its statement of policy, declared in
part:

> "Economic insecurity due to unemployment is
> a serious menace to the health, morals and welfare
> of the people of this state. Unemployment - - -
> requires appropriate action by the legislature to
> prevent its spread and to lighten its burden which
> may fall upon the unemployed worker, his family
> and the entire community. - - - This objective
> can be furthered - - - by devising appropriate
> methods for reducing the volume of unemploy-
> ment; and by the systematic accumulation of
> funds during periods of employment from which
> benefits may be paid for periods of unemployment
> - - - ."

Thus the Legislature spoke in terms of economic security
for the unemployed and followed this statement of policy
with legislation tending to minimize the "serious social
consequences of unemployment."

The SUB Plan is designed to strengthen the economic
security of the employee — not to weaken it.

To hold that the benefits paid under the supplemental
unemployment insurance afforded by SUB Plan are wages
and thereby disqualifying the employee from receiving
State benefits to the extent of said payments would be in-
consistent with and do violence to the declared legislative
philosophy and purposes as expressed in the declaration

of policy under which the Maine Employment Security Law was enacted.

The entry will be:

*Appeal denied.*